# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 24-2830

HUDSON HOSPITAL OPCO, LLC d/b/a Carepoint Health Christ Hospital; IJKG, LLC; IJKG PROPCO LLC; HUMC OPCO LLC d/b/a Carepoint Health Hoboken University Medical Center,
Appellants

v.

CIGNA HEALTH AND LIFE INSURANCE COMPANY; CONNECTICUT GENERAL LIFE INSURANCE COMPANY

_____

Appeal from the U.S. District Court, D.N.J.
Judge Jamel K. Semper, No. 2:22-cv-04964

Before: SHWARTZ, FREEMAN, and RENDELL, *Circuit Judges*
Submitted Jul. 8, 2025; Decided Jul. 16, 2026
_____

NONPRECEDENTIAL OPINION[*]

FREEMAN, *Circuit Judge.*

Three hospitals appeal the dismissal of claims they brought against insurance providers under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. We will AFFIRM the dismissal of the ERISA fiduciary-duty claims. However, because the District Court failed to construe the facts alleged in the operative complaint in the light most favorable to the plaintiffs, we will VACATE the dismissal of most ERISA breach-of-contract claims and REMAND for further proceedings.

_____

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

Plaintiffs are three New-Jersey-based hospitals: Christ Hospital, Bayonne Medical Center, and Hoboken University Medical Center (the "Hospitals"). The Hospitals allege that two insurance carriers—Cigna Health and Life Insurance Company and Connecticut General Life Insurance Company (collectively, "Cigna")—underpaid them for healthcare services they provided to Cigna subscribers from March 2016 through May 2021.[1] They claim that these underpayments violate the terms of Cigna's health insurance plans (the "Plans").

Cigna was required to reimburse the Hospitals for covered expenses at the out-of-network provider rates specified in the Plans.[2] For elective treatments, each Plan required Cigna to calculate reimbursement based on one of three methodologies: MRC-1, MRC-2 or R&C.[3],[4] Ultimately, Cigna was required to pay the Hospitals the relevant

---

[1] "Out-of-network" providers are those that do not have contracts with insurance providers to accept pre-negotiated rates.

[2] The Hospitals also alleged that Cigna failed to reimburse emergency claims as required by the "Greatest of Three" Regulation. However, on appeal, the Hospitals argue in just a single footnote that this claim should not have been dismissed. We deem this argument forfeited. *Fed. Trade Comm'n v. AbbVie Inc,* 976 F.3d 327, 368 n.3 (3d Cir. 2020) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are forfeited on appeal." (citation modified)).

[3] "RC means Maximum Reimbursable Charge, and R&C means Reasonable and Customary.

[4] The Hospitals attached to their complaint a few examples of the Plans utilizing each of these calculation methods. Cigna suggests that the Hospitals were required to provide the relevant plan language for every Plan at issue. We disagree. Cigna does not dispute that the Plan methodologies are accurately described in the second amended complaint. In any event, at the motion to dismiss stage, the Hospitals' allegations that each Plan uses these methods and that they operate substantially similarly across Plans is sufficient.

MRC or R&C value, less any applicable co-insurance, co-payments, or deductibles.

1.  MRC-1

Plans utilizing the MRC-1 method for calculating reimbursements include language substantially similar to the following:

> The Maximum Reimbursable Charge for covered services is determined based on the lesser of:
>
> • the provider's normal charge for a similar service or supply;
>
> or
>
> • a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.

App. 76–77.

The Hospitals allege that their normal charges are reflected in each hospital's Chargemaster, which is a publicly available list of a hospital's standard charges for services and supplies. They further allege that they billed Cigna their normal Chargemaster rates by submitting (1) a standard claim form that lists those normal charges for each service or supply and (2) an itemized statement informing Cigna of which services or supplies they provided to the Cigna subscriber, and the related normal charges based on the Chargemaster rates. The Hospitals also allege, based on Cigna's admissions in other litigation, that the "policyholder-selected percentile of charges . . . compiled in a database selected by Cigna" referenced in the MRC-1 method is the 80th percentile (or, in a few cases, the 90th percentile) of the FAIR Health

database.[5]  App. 77–78.

The Hospitals explain that because their "normal charges . . . are consistent with other hospitals' charges in the same or similar geographic area," they "do not exceed the charges as calculated at the 80th percentile of the FAIR Health database."  App. 90. Thus, the MRC-1 method "should result in reimbursement at or near the . . . Hospitals' normal charges, less applicable cost-sharing."  *Id*.  However, for thousands of claims, the Hospitals were reimbursed amounts that were lower than the Plans required.

2.  MRC-2

Plans using the MRC-2 method use language substantially similar to the following:

> The Maximum Reimbursable Charge for covered services is determined based on the lesser of:
>
> • the provider's normal charge for a similar service or supply;
>
> or
>
> • a policyholder-selected percentage of a schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.

App. 79.  We will refer to this as the "first MRC-2 approach."

Those plans also provide a second way to calculate the MRC-2 amount (the "second MRC-2 approach"):

---

[5] The FAIR Health database uses information from billions of claims to estimate what medical providers charge, and what insurers pay, for providing healthcare to patients.

In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:

• the provider's normal charge for a similar service or supply;

or

• the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.

App. 79–80.

The Hospitals allege, based on Cigna's admissions in other litigation, that Cigna has never developed the Medicare-based schedule that the first MRC-2 approach uses; instead, Cigna "simply relies on a database into which it has inputted the traditional Medicare rates." App. 80. The Hospitals explain that, because Cigna did not develop the contemplated schedule, the MRC-2 amount must be calculated using the second MRC-2 approach. Thus, the MRC-2 amount is the lesser of (1) the provider's normal charges, or (2) the 80th percentile of charges from the given geographic area "compiled in a database selected by Cigna," which the Hospitals allege is the FAIR Health database. App. 81.

Accordingly, the Hospitals allege that the MRC-2 method ends up working similarly to the MRC-1 method: it requires reimbursement of the lesser of a provider's normal charges or the 80th percentile of the FAIR Health database. But, for thousands of claims, Cigna's reimbursements to the Hospitals fell below those required amounts.

3. R&C

For R&C Plans, the Hospitals allege that, while the "reimbursement language [of each Plan] varies," the Plans "generally point to an external standard based on charges of

5

other providers in the same or similar geographic area." App. 81.

For example, two Plans define R&C as "not more than the usual or customary charge for the service or supply as determined by Cigna, based on a standard which is most often charged for a given service by a Provider within the same geographic area." App. 81–82. Three others define R&C as being based on "average claims data in your area and are determined by your health care company." *Id.*[6]

The Hospitals allege that the "external standard that Cigna uses to calculate the charges of other providers in the same or similar geographic area is the FAIR Health database," App. 83, and proper calculation of reimbursements under R&C "should result in reimbursement at or near the [Hospitals'] normal charges," App. 90.

4. Fiduciary duties

The Hospitals also allege that Cigna violated its ERISA-imposed fiduciary duties of loyalty and due care by engaging in "self-dealing and financial arrangements that benefitted Cigna . . . at the expense of its [Plan] beneficiaries." App. 102. Specifically, the Hospitals allege that Cigna entered into an arrangement with many of the Cigna Plans which it refers to as the "cost-containment program." App. 101. Under this program, "Cigna paid itself and its third-party business partners 'fees' based on a percentage of the . . . 'savings' [that] Cigna achieved" on a given claim. *Id.* Those "savings" were based on "the amounts by which Cigna underpaid the claims at issue." *Id.* Thus, the cost-containment program "creates a built-in incentive for Cigna and its business partners to

---

[6] In their complaint, the Hospitals identify two R&C Plans that do not rely on standard charges for services in the same geographic area.

have the Plans reimburse valid health care claims as little as possible and well below what the Plans actually require." App. 102.

## II

The Hospitals sued Cigna in 2022 and then twice amended their complaint (once as of right and then a second time after a dismissal without prejudice). Their second amended complaint brings ERISA claims for failure to pay benefits due under the Plan and for violations of fiduciary duties, as well as several state law claims.

In September 2024, the District Court dismissed the second amended complaint with prejudice. It determined that the Hospitals failed to "plead that [Cigna] did not pay 'the lesser of' [the Hospitals'] 'normal charges' or the Plan-established rates," so it dismissed the ERISA benefits claim on that basis. App. 13. Because the ERISA fiduciary-duty claim depended on the Hospitals' allegations that they were underpaid, the District Court dismissed that claim as well. Having dismissed all the federal claims in the case, the District Court declined to exercise supplemental jurisdiction over the state law claims, noting that they failed in any event. The Hospitals timely appealed.

## III[7]

The Hospitals argue that they adequately alleged their normal charges and all other requirements for their ERISA benefits and fiduciary-duty claims. Cigna responds that the

[7] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review of a district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), applying the same standard as the district court. *Rivera v. Monko*,

7

Hospitals lack standing to bring some of their claims because of anti-assignment provisions in some of the Plans. Even where the Hospitals have standing, Cigna argues that their allegations do not state a claim upon which relief can be granted.

A

Of the 114 Plans identified thus far in this litigation, Cigna identifies at least 36 with anti-assignment provisions.[8] It argues that the Hospitals lack standing to sue for benefits under those Plans.[9]

The Hospitals counter that in 29 of the Plans that include anti-assignment provisions, additional provisions allow policyholders to assign the right to payment, and these provisions function as a carve-out to the general anti-assignment rule. With regard to those 29 Plans (the "Carve-Out Plans"), we agree with the Hospitals.

By way of example, one of the Carve-Out Plans provides as follows:

> You may not assign to any party, including, but not limited to, a provider of healthcare services/items, your right to benefits under this plan, nor may you assign any administrative, statutory, or legal rights or causes of action you may have under ERISA, including, but not limited to, any right to make a claim for plan benefits . . . or to file lawsuits under ERISA.

_____

37 F.4th 909, 914 (3d Cir. 2022); *Morrow v. Balaski,* 719 F.3d 160, 165 (3d Cir. 2013) (en banc). This means we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (citation modified).

[8] At this stage of the litigation, there is no reason to doubt the Hospitals' standing to seek payment under the remaining 78 Plans. Indeed, at least 23 of those Plans appear to expressly permit assignment.

[9] Cigna raised its standing argument below, but the District Court did not address it.

> Any attempt to assign such rights shall be void and unenforceable under all circumstances.

App. 203. This language appears to ban the assignment of any rights under the Plan. But the next paragraph states:

> You may, however, authorize Cigna to pay any healthcare benefits under this policy to a Participating or Non-Participating Provider.

*Id.* The latter provision works as a carve-out to the general anti-assignment rule.

"Where claims put at issue the meaning of [ERISA] plan terms, we apply the federal common law of contract to interpret those terms." *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011). And "[i]t is well established that within a particular document containing conflicting specific and general provisions, the specific provisions control." *Schulz v. U.S. Boxing Ass'n*, 105 F.3d 127, 135 n.19 (3d Cir. 1997); *see Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234, 245 (3d Cir. 2005) (noting that "general, boilerplate language . . . must yield to . . . specific direction"). Applying this principle here, the Carve-Out Plans' *general* anti-assignment provisions are qualified by their *specific* exception for assignment of payment—notwithstanding that "anti-assignment clauses in ERISA-governed health insurance plans are generally enforceable." *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 455 (3d Cir. 2018).

"[W]hen a patient assigns payment of insurance benefits to a healthcare provider, that provider gains standing to sue for that payment under ERISA § 502(a)" because "assignment of the right to payment logically entails the right to sue for non-payment."

9

*N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 372 (3d Cir. 2015).  Here, the patients invoked the carve-out provisions to assign the right to payment to the Hospitals, so they also provided the Hospitals with the right to sue for non-payment.  Thus, the 29 Carve-Out Plans' anti-assignment provisions do not bar the Hospitals' suit for payment.[10]

Seven other Plans contain anti-assignment provisions but do not include the payment carveout.  Upon remand, the District Court shall consider, in the first instance, whether the Hospitals have standing to bring claims related to those Plans.

B

Next, we consider whether the Hospitals have stated a claim that entitles them "to recover benefits due to [them] under the terms" of the Plans.  29 U.S.C. § 1132(a)(1)(B).  To recover under this section of ERISA, a plaintiff "must demonstrate that the benefits are actually 'due'; that is, he or she must have a right to benefits that is legally enforceable against the plan." *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006); *see Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012).

The District Court rejected the Hospitals' allegation that their Chargemaster rates constituted their normal charges.  It reasoned that, because the very same charges were labeled "Total Charges" in a previous version of the complaint, the provided figures were

---

[10] This is true notwithstanding language in at least some Plans that a subscriber "may not interpret or rely upon this discrete authorization or permission to pay any healthcare benefits to a Participating or Non-Participating Provider as the authority to assign any other rights under this policy to any party, including, but not limited to, a provider of healthcare services/items." *See, e.g.*, App. 203, 268, 360, 435, 812.  Here, the subscribers do not seek to assign an "any *other* rights"—just the right that is expressly assignable: the right to payment.

10

the Hospitals' *billed* charges, not their normal charges. Opining that it is "inappropriate to conflate billed charges with normal charges," the District Court determined that the Hospitals had not sufficiently pleaded their normal charges in a way that supported their claims. App. 14–15 (internal quotation marks omitted). We disagree.

On a motion to dismiss, we are obligated to accept as true the Hospitals' allegations regarding their normal charges. At this stage in the litigation, the Hospitals' allegation that they billed Cigna their normal charges (which was corroborated by their publicly available Chargemasters) suffices to establish their normal charges. The same goes for the Hospitals' allegations that the database used by the MRC-1 and MRC-2 Plans was the FAIR Health database and that Cigna did not develop a Medicare-based schedule as described in MRC-2.

So the Hospitals have sufficiently alleged that the MRC-1 and MRC-2 methods required reimbursement at the lesser of (1) the Hospitals' normal charges, as reflected in the Chargemasters and billed to Cigna or (2) the 80th to 90th percentile of the FAIR Health database; and because their normal charges (as indicated on the Chargemasters) are consistent with those of other hospitals in the area, they do not exceed the 80th percentile of the FAIR Health database. Because the Hospitals allege that their billed amount *was* their normal charge, and they were reimbursed at an amount short of that,

11

they have stated a claim as to MRC-1 and MRC-2 Plans for which they are entitled to payment under ERISA.[11]

By contrast, the Hospitals' R&C allegations miss the mark. Although the Hospitals alleged that MRC-1 and MRC-2 language across the Plans is substantially similar in every Plan that uses one of these methods, that is not true of the R&C method. They concede in the operative complaint that "the reimbursement language varies" in Plans that use the R&C method. App. 81.

The Hospitals try to get around those variations by alleging that all R&C Plans "generally point to an external standard based on charges of other providers in the same or similar geographic area," and that this standard is set by reference to the FAIR Health database. App. 81. They are correct that some R&C Plans reference the "prevailing" or "usual" fee in a given area, *e.g.*, App. 958, 976, while others mention "average claims

---

[11] The Hospitals identify four MRC-1 and four MRC-2 Plans that are formulated somewhat differently from the other MRC Plans. The atypical MRC-1 Plans' reimbursement calculations are based on either the lesser of providers' normal charges or the 80th or 90th percentile of the FAIR Health database, or, in some cases, the 80th or 90th percentile of the FAIR Health database outright. Based on the Hospitals' allegations, these Plans should have operated like the other MRC-1 Plans, resulting in similar reimbursements despite differences in their language.

For the atypical MRC-2 Plans, the reimbursement rate is set based on "a methodology similar to Medicare," *see, e.g.*, App. 983; a percentile of what providers in the area charge for the service; or the normal charges for the service. As with the other MRC-2 Plans, the Hospitals allege that Cigna's failure to develop the Medicare-based schedule means that these Plans also default to either normal charges or a percentile of the FAIR Health database. Drawing all inferences in the light most favorable to the Hospitals, we read the complaint as alleging that these plans are also specifically based on the 80th percentile of the FAIR Health database. Thus, based on the Hospitals' allegations, these MRC-2 Plans yield the same reimbursements as the typical ones, even though they use different terms.

12

data in your area," *e.g.*, App. 972–73. But, unlike with their MRC-1 and MRC-2 allegations, the Hospitals do not allege what percentile of the FAIR Health database Cigna uses to set reimbursement rates for Plans using the R&C method. Moreover, the R&C language in some Plans provides Cigna with a high degree of discretion: "usual charges" and "prevailing fees" are just two of the "various factors" that Cigna may consider in setting rates. App. 982. Given the variation in the language of these Plans and the discrepancies in how they operate we cannot reasonably draw the inference that the Hospitals were routinely underpaid for R&C claims.

Accordingly, we will vacate the dismissal of the Hospitals' ERISA claim for recovery of benefits under to the MRC-1 and MRC-2 Plans, and we will affirm the dismissal of that ERISA claim as to the R&C Plans.

C

Under ERISA, "a participant, beneficiary, or fiduciary" may bring a civil action to "enjoin any act or practice which violates [ERISA], or . . . to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). But a plaintiff must suffer a "concrete injury" to have standing to bring claims under this provision, because "there is no ERISA exception to Article III." *Thole v. U. S. Bank N.A*, 590 U.S. 538, 544, 547 (2020). Financial harm is a concrete injury that can establish standing for such claims, but "allegations that stand on nothing more than supposition cannot establish financial harm." *Knudsen v. MetLife Grp., Inc*., 117 F.4th 570, 580 (3d Cir. 2024) (citation modified).

13

The Hospitals allege that Cigna's cost-containment program unlawfully benefited Cigna and amounted to self-dealing, in violation of the fiduciary duties of due care and loyalty. They seek equitable relief, "including disgorgement of all so-called 'cost-containment' fees improperly collected by Cigna and its business partners and withheld from" the Practices. App. 110.

To establish an injury, the Hospitals needed to show a right to the cost-containment fees "such that, [Cigna's] purportedly unlawful retention of the monies harmed [them]." *Knudsen*, 117 F.4th at 582 (quoting *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 417 (3d Cir. 2013)). The Hospitals have not made the necessary showing. The complaint does not establish that the Practices had a right to the cost-containment fees, which Cigna pays itself pursuant to agreements with the Plans. Although the Hospitals allege that the program incentivized Cigna to pay them less, they do not allege that they had a right to be paid more than the amounts that they negotiated with Cigna. We therefore will affirm the dismissal of the Hospitals' fiduciary duty claim.[12]

*       *       *

---

[12] Because we dismiss the fiduciary-duty claim for lack of standing, we do not reach Cigna's argument that it is not a plan fiduciary.

Because the Hospitals do not appeal the District Court's disposition of the state law claims, those claims are deemed abandoned.

14

For the reasons set forth above, we will AFFIRM in part and VACATE in part the District Court's order dismissing the Hospitals' second amended complaint, and we will REMAND for further proceedings.

15